# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRIENDS OF ANIMALS, et al., <br> Petitioners, | : <br> : <br> : | CIVIL ACTION |
| v. | : <br> : <br> : | No. 2:09-cv-5349 |
| U.S. NATIONAL PARKS MIKE CALDWELL, in his official capacity of superintendent of Valley Forge National Historic Park, et al., <br> Respondents. | : <br> : <br> : <br> : <br> : | |

**Goldberg, J.**                                                                                  **October 27, 2010**

## MEMORANDUM OPINION

The Valley Forge National Historical Park is being overrun by white-tailed deer. Within the protected confines of this historic park, the overpopulated white-tailed deer have flourished and currently threaten the forested areas and archaeological structures in the park. These facts are undisputed.

Respondents in this matter, the National Park Service (hereinafter "NPS"), have carefully evaluated potential solutions to this problem and determined that a culling of the deer population over the span of four years is necessary to achieve the desired population density and prevent further damage to the park. Petitioners, two animal rights groups,[1] seek to enjoin the NPS from culling the deer and allege that the NPS has not complied with all statutory obligations and considered other alternatives, which include fencing and introducing coyotes as a "natural" means of reducing the deer population.

Before the Court are the parties' cross-motions for summary judgment. For the reasons that

---

[1] Plaintiffs are the Friends of Animals, a Connecticut non-profit organization, and Compassion for Animals, Respect for the Environment, a Pennsylvania non-profit organization.

follow, Respondents' motion will be granted and Petitioners' motion will be denied.

**I.      BACKGROUND**

The Valley Forge National Historical Park's mission is to "preserve and commemorate . . . the area associated with heroic suffering, hardship, and determination and resolve of General George Washington's Continental Army during the winter of 1777-78." 16 U.S.C. § 410aa.  The park receives over one million visitors per year who come not only to honor its historical significance where thousands suffered, but also to appreciate the park's open spaces, forests, and wildlife.

The park comprises five and a half square miles and lies eighteen miles northwest of Philadelphia.  Its boundaries abut part of the Schuylkill River, Interstate 76, and various residential and commercial areas.  (Administrative Record (hereinafter "AR"), 000028, 000053-54.)

Given the protective nature of life within the park, between 1983 and 2009, the deer population has grown exponentially from 31 to 35 deer per square mile to 241 deer per square mile. As noted above, the overabundance of this herbivore has decimated the forested areas of the park and optimal forest regeneration cannot occur unless the population returns to 1983 numbers.  The current population numbers also threaten historical and archeological structures within the park. (AR, 000001.)

**A.      The NPS Plan**

The NPS engaged in a three-year study during which various plans for managing the park's deer population were considered and made available for public comment.  On August 28, 2009, the NPS issued its "Record of Decision: White-tailed Deer Management Plan and Environmental Impact Statement - Valley Forge National Historical Park, Pennsylvania."  The lawsuit currently before the Court commenced with the filing of a complaint on November 12, 2009.  While the parties initially

agreed to stay the culling, the NPS currently intends to go forward with its culling plan in November of 2010. (Resps.' Memo., pp. 4-5.)

The purpose of the NPS plan is "to develop a white-tailed deer management strategy that supports long-term protection, preservation, and restoration of native vegetation and other natural and cultural resources while maintaining a deer population . . . ." (AR, 000001.) The plan is also designed to respond to chronic wasting disease in the park.[2] The objectives of the plan are, inter alia, to promote natural restoration of native vegetation, maintain a white-tailed deer population which allows for regeneration of native plant life, protect other native wildlife species, reduce the probability of CWD, and protect the integrity of the cultural landscape and archeological resources. The plan considered four alternatives: (A) No-action, (B) Combined Nonlethal Actions, (C) Combined Lethal Actions, and (D) Combined Lethal and Nonlethal Actions. The plan selected by the NPS is Alternative D. (AR, 000001-02, 000012.)

### B. The Alternatives Considered

Alternative A called for continued deer population and vegetation monitoring as well as small, fenced areas to protect selected vegetation. This alternative was rejected because it failed to meet the objectives of the plan, namely - it did not provide for a means to reduce the deer population or curb its growth. (AR, 000012, 000014.)

Alternative B called for rotational fencing of selected forest areas in addition to all of the actions provided for in Alternative A. The fencing would cover ten acres at a time and would be rotated to cover a total of forty acres as each ten acre plot reached satisfactory forest regeneration

---

[2] Chronic wasting disease (hereinafter "CWD") is a "fatal, neurological disease identified in free-ranging and captive mule deer, white-tailed deer, elk, and moose." (AR, 000002.)

levels. The fencing would be coupled with a chemical reproductive control agent when such an agent becomes available.[3] This alternative was rejected because it would cover only 10-15% of the forested area of the park over the life of the plan. The fencing also did not fit within the aesthetically pleasing nature of the historic park and would limit public access. (AR, 000012, 000014-15.)

Alternative C would include all of the provisions in Alternative A plus an immediate reduction in the deer population through sharpshooting, and capture and euthanasia. While this alternative had many similarities to the plan selected by the NPS, it was rejected because it required longer periods of park closure to visitors due to the planned shooting period. (AR, 000012, 000015.)

Alternative D provides for an immediate reduction of deer, to continue over a four-year period, by sharpshooting and in some instances, capture and euthanasia. The shorter time period for park closures and the addition of chemical birth control, when it becomes available, distinguishes this alternative from Alternative C. The selected alternative provides for adaptive management, which is "a systematic approach for dealing with uncertainty inherent in natural systems in order to improve resource management by learning from management outcomes." This management system will allow the NPS to assess the deer herd size each year and remove the appropriate number of animals necessary to achieve the desired population density.

The specifics of Alternative D call for the use of sharpshooters at night, stationed at elevated positions with silencers and night vision equipment. The deer will be attracted to safe removal locations by the use of bait stations. These measures will be undertaken to create the safest culling environment while being the least disturbing to park visitors and neighbors. While capture and

---

[3] Currently there is no acceptable chemical birth control agent available for the treatment of large, free-ranging populations of deer. (AR, 000016, 000478-89, 003069-72.)

euthanasia will be used in situations where sharpshooting is not safe, this scenario occurs in approximately less than 1% of the deer culled. Does will be targeted over bucks to more efficiently reduce the herd size by limiting its future reproductive capacity. In addition to the culling, when an acceptable chemical reproductive agent becomes available, the alternative includes provisions to implement this part of the plan. Alternative D also contains CWD monitoring and prevention provisions. Finally, the selected plan includes provisions for butchering and donating the venison of all suitable culled animals to food banks. (AR, 000002-11.)

## II. ANALYSIS

### A. Standard of Review

While the cross-motions currently before the Court are motions for summary judgment, the standard of review is not that of the typical FED.R.CIV.P. 56 motion but rather of an Administrative Procedure Act record-review. The court may only set aside a decision of the NPS if it is arbitrary and capricious, not in accordance with the law or an abuse of discretion. 5 U.S.C. § 706(2)(A). In determining whether an agency's decision is arbitrary or capricious, the Court must defer to the agency's interpretation of a statute so long as it is reasonable and consistent with the statutory purpose. OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 814 (D.C. Cir. 1998) (citations omitted). The court must also defer to the agency's interpretation of its own policies so long as it does not violate the Constitution or a federal statute, unless it is clearly erroneous. Everett v. United States, 158 F.3d 1364, 1367 (D.C. Cir. 1998) (citations omitted). This highly deferential standard means:

> [T]he Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review

5

is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). In short, the reviewing court must determine whether the agency's decision making was reasoned, whether the agency considered the relevant factors, and whether those factors have some basis in the record. Nat'l Treasury Emps. Union v. Horner, 854 F.2d 490, 498 (D.C. Cir. 1988) (citations omitted).

### B. National Environmental Policy Act

The National Environmental Policy Act, 42 U.S.C. § 4321, et seq., (hereinafter "NEPA"), one of the controlling statutes in this matter, requires an agency to prepare an environmental impact statement which "specif[ies] the underlying purpose and need to which the agency is responding" and "[r]igorously explore[s] and objectively evaluate[s] all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss[es] the reasons for their having been eliminated." 40 C.F.R. §§ 1502.13, 1502.14.

Under this statute, the court must evaluate whether the objectives of the plan have been reasonably identified and defined. Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195-96 (D.C. Cir. 1991). The court must then evaluate whether the alternatives were reasonable in light of those objectives. Id. Reasonable alternatives are those which are practical and feasible from a technical and economical standpoint and those which derive from common sense. Twp. of Belleville v. Fed. Transit Admin., 30 F.Supp.2d 782, 798 (D.N.J. 1998) (citing Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 551 (1978)). The court must give deference to the agency's expertise and policy-making role as long as the agency came to a fully informed decision, and the decision is not arbitrary or capricious. City of Alexandria v. Slater, 198

F.3d 862, 867 (D.C. Cir. 1999) (citations omitted).

Petitioners challenge the plan on two grounds under the NEPA. First, they posit that the NPS failed to consider an adequate range of reasonable alternatives. Second, Petitioners claim that the NPS failed to resolve conflicts between the plan and local laws. We address each of these challenges below.

        **1.**      **Reasonable Alternatives**

            **a.**      **The Inclusion of Birth Control in the Alternatives**

Petitioners first argue that the plan is tainted because two of the alternatives considered included provisions for chemical birth control. Because an approved birth control does not currently exist for large, free-ranging populations of deer, Petitioners claim that the alternatives considered were too speculative, and the NPS should be required to re-evaluate the environmental impact statement sans birth control. (Pets.' Memo., pp. 10-12.)

What Petitioner's argument fails to acknowledge is that the selected plan only recommends the use of birth control once an approved chemical birth control agent is available. Because the use of birth control would not reduce the current size of the herd, but merely limit future growth, the plan calls for the implementation of birth control measures after the culling is completed. The NPS did not find this method of population control to be remote or speculative because scientific literature suggests that an acceptable chemical agent will be available in five to six years. Moreover, the proposed plan's primary objective is to cull the herd by sharpshooting over a four year time period to immediately reduce the population. The sharpshooting is to be followed by subsequent population management in the years after that period, and included a supplemental scientific method for population control with an anticipated availability in the near future. (AR, 000016, 000478-89,

003069-72.) We find that this plan is neither arbitrary nor capricious and exemplifies "a fully informed decision."

### b. Alternatives Considered

Petitioners next question the NPS's evaluation of no-action, fencing, and the similarity of Alternatives C and D. Petitioners maintain that the environmental impact statement did not evaluate a sufficient number of reasonable alternatives and that the alternatives included presented the NPS with only one viable alternative. (Pets.' Memo., pp. 12-15.)

The administrative record before us was developed over a span of three years, consists of more than 15,000 pages and evaluated the four alternatives at great length. The NPS weighed the pros and cons of each of the available alternatives in order to determine which one met the most objectives set forth in the plan.

Petitioners have not demonstrated how the NPS's rejection of fencing all of the park or using rotational fencing was arbitrary or capricious. The NPS concluded that fencing the entire park would have adverse effects on the deer and neighboring communities. They also concluded that rotational fencing would not meet enough of the plan's objectives because it would interfere with the natural landscape of the park and protect only a very limited portion of the park lands in need of regeneration. (AR, 000014-15, 000116.) We find that these determinations were supported by the record and are not arbitrary or capricious.

Additionally, Petitioners complain that the NPS did not consider Alternative A and the similarities between Alternatives C and D. The Record of Decision expressly details how each alternative does or does not meet the objectives of the plan. The no-action alternative of Alternative A was rejected for failing to reduce the size of the herd. Rejection of this alternative is anything but

arbitrary or capricious.

Likewise, Petitioners have not identified how the similarities of Alternatives C and D establish that the NPS's decision was arbitrary or capricious. Alternatives C and D do differ in that the selected Alternative D allows for future adaptions of the plan to include birth control methods, if and when they become available. Alternative C does not contain that provision and was also rejected because it provided for the cull to take place over a longer period of time than Alternative D. (AR, 000002-12, 000014-15.) The Court will not supplant the NPS's decision making with its own, and, given the in-depth analysis afforded to all of the alternatives and the ample support found throughout the voluminous administrative record, there is nothing arbitrary or capricious about the alternatives considered by the NPS.

### c. Coyotes

Petitioners' final objection to the alternatives considered by the NPS is the absence of a specific alternative using natural predators, namely - coyotes, to manage the herd size. Petitioners argue that the NPS, in failing to consider the use of coyotes, did not meet its obligation to consider all reasonable alternatives in an environmental impact statement. (Pets.' Memo., pp. 15-20.) We disagree for several reasons.

First, the NPS is only obligated to consider "options that meet the purpose and need of the project within the reasonable judgment of the agency." Rivers Unlimited v. U.S. Dep't of Transp., 533 F.Supp.2d 1, 3 (D.D.C. 2008). The NPS did just that by extensively evaluating the four alternatives and the objectives set forth in the plan.

Secondly, the NPS did in fact consider the use of natural predators in Alternative A, the no-action plan. There, it was noted that despite an already existing small presence of coyotes in the

park, the deer herd size has nonetheless swelled to an unsustainable number. (AR, 000002-11, 000145, 002581, 009566, 010821, 011174, 012091, 012666-67, 012689.)

Lastly, the fact that the NPS did not consider increasing the coyote population is a reasonable judgment that the NPS was permitted to make, and it is not proper for this Court to overstep our considerable deference obligation and question this judgment. <u>Id.</u>

Indeed, Petitioners acknowledge that the plan's reasonable alternatives must "derive from common sense." <u>Twp. Of Belleville</u>, 30 F.Supp. at 798. Petitioners' suggestion that an increased number of coyotes be introduced to a park, which, according to Petitioners, "lies eighteen miles northwest of the city center of Philadelphia and spans five townships" seems to be inconsistent with a "common sense" approach. (Pets.' Memo., pp. 6 (citing 48 Fed. Reg. 34263 (July 28, 1983)), 17 n. 3; Pets.' Undisputed State. of Facts, ¶ 5.)

### 2. **Conflict with Local Laws**

Petitioners final objection under the NEPA is the plan's alleged lack of discussion regarding a conflict with local laws. Petitioners cite 40 C.F.R. § 1502.16(c) for the proposition that the plan is obligated to address conflicts between local laws, here - laws involving firearms, and the proposed plan. Petitioners argue that because each of the five townships surrounding the park have general prohibitions on shooting, although most contain exceptions for hunting, the plan had to address conflicts with those laws. (Pets.' Memo., pp. 20-22.)

40 C.F.R. § 1502.16(c) only applies to potential conflicts with land use, which is not at issue here, making Petitioners' reliance on this statute misguided. Nonetheless, the NPS did consult with township officials, who agreed with the proposals in the plan. Given the safety measures provided for in the plan and the consultation with local townships, we find nothing arbitrary or capricious with

the NPS's handling of the culling in terms of neighboring townships. (AR, 001071.)

### C. Organic Act

Petitioners also cite to the National Park Service Organic Act, 16 U.S.C § 1, et seq., in support of their motion. This Act mandates that the NPS promote and regulate park use:

> . . . by such means and measures as conform to [its] fundamental purpose . . . to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

Id. The Organic Act states that the Secretary of the Interior "may . . . provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any said parks, monuments, or reservations." 16 U.S.C § 3. Because the statute does not speak specifically to park management, the Secretary has broad discretion as to how to implement this mandate. See Daingerfield Island Protective Soc'y v. Babbitt, 40 F.3d 442, 446 (D.C. Cir. 1994). However, before the NPS may begin a controlled cull, the NPS must make a finding of detriment. Davis v. Latschar, 83 F.Supp.2d 1, 5-6 (D.D.C. 1999) (citing Intertribal Bison Coop. v. Babbitt, 25 F.Supp.2d 1135, 1138-39 (D.Mont. 1998)). Under the Organic Act, each national park must also be administered in accordance with its enabling legislation, here - The Valley Forge Enabling Legislation. 16 U.S.C. § 1c(b). The court's review of a claim of non-compliance with the Organic Act is brought under the APA and is deferential to the NPS's review. Davis, 83 F.Supp.2d at 4.

Petitioners argue that culling the deer herd is against the Organic Act's mandate to "conserve . . . the wild life," in national parks. Petitioners continue to maintain that natural management, not culling by sharpshooters, is the only plan consistent with the Organic Act. (Pets.' Memo., pp. 22-24.)

Petitioners ignore the Secretary of the Interior's clear mandate under the Organic Act to provide for the destruction of animals that may be a detriment to the park. 16 U.S.C § 3. Because the NPS has clearly identified overgrazing by the herd as the cause of insufficient forest generation, which is a detriment to the scenery and natural and historic objects, the exception to preserving all wildlife under the Organic Act has clearly been invoked here. Petitioners have not identified how this finding of a detriment and the NPS's plan to remedy it is arbitrary or capricious under the Organic Act.

### III. CONCLUSION

For the foregoing reasons, this Court concludes that Petitioners have not established that the Record of Decision and the plan to proceed with a cull of the deer herd in Valley Forge National Historical Park was arbitrary or capricious. Accordingly, Petitioners' motion for summary judgment is denied and Respondents' motion for summary judgment is granted. Our Order follows.